Honorable Judges of the U.S. Court of Appeals for the 4th Circuit. You may be seated. Our next case this morning is Hobet Mining v. the Director of the Office of Workers' Compensation Programs, Department of Labor, I think. Mr. Dray. Good morning. May it please the Court, I'm Dominic Dray, and with Michael Pusateri, I represent the appellant, Arch Resources. The obligation to insure someone else's liability does not spring from nothing. Insurance obligations come from contracts or laws that impose them, what the 7th Circuit in Grimes called, quote, some basis in positive law, end quote. In this case, however, the Department of Labor attempts to create an insurance obligation without any basis in positive law, and in fact, in spite of filings with the Department, indicating that Arch would no longer be insuring Hobet Mining after its sale, and that its subsequent owner would be insuring it. Crucially and correctly, the ALJ and the Board recognized that Arch did not operate the mine where Mr. Meredith worked, but they erred in importing a rule from operator liability to create an insurance obligation on Arch. That is the heart of this case. So it's interesting, the insurance obligation under these regs and in y'all's papers is referred to self-insurance. It really doesn't seem like it's self-insurance. The self, as the regs seem to talk about, is the operator, and the operator is Hobet. And so what we really have is a parent stepping in, it seems like, and to the role financially, as its subsidiary. Now I don't know what to really make of that, but that's what it seems like is going on. And one way to think about that is if you're going to step into that role of self-insurer, you got to take the good bad with the good. But I think it's pretty clear that your opponents aren't saying you're the operator. So I think that gets to your point, that whatever your obligation as a self-insurer, we got to look at it and see what the terms of it are. That's exactly right. And I think the crux of your Honor's question, your insight is this is a parent-subsidiary relationship, and while they are parent-subsidiary, Hobet is part of Arch's self. Once it sells Hobet and tells the Department of Labor, we've sold this, it belongs to Magnum now, which becomes Patriot, which declares bankruptcy. It's no longer part of Arch's self. I thought the regulations put the burden on the last employer. That is true. All we're talking about here is who's going to pay the benefits. I mean, it's a big case part, you all are concerned because there's more of them. But for this particular claimant, everybody agrees, they don't contest, he's disabled, which qualifies for black plug benefits. And he's going to get them, or his wife's going to get them. I'm not sure he's still living, but you'd say he is. And he's a West Virginia coal miner. His Hobet's over there on the road just south of Charleston. It's a big operation, it's been there for a long time, mostly surface mines. This fellow is disabled and he's been getting these benefits from Arch, right? Because they ordered him to pay. I believe he's been getting them from the trust fund. He's been getting them from the trust fund. However he's getting them, he's getting them. He's been getting paid, he will be paid. But the director ordered Arch to pay. Yes. And you're appealing that because you're saying that's wrong. That's correct. Because, and this, you know, your Honor's insight began with the last day work rule. That comes from operator liability. Operator liability. So it's vitally important that in this case... Hobet is the operator. Hobet is the operator. Arch is expressly rejected as the operator. Arch is then held liable as an insurer. Which brings us to my big question this morning. Where does the insurance liability come from? There is no source of positive law that says that if you once insured somebody as under a self-insurance plan, that you have to do that forever and ever. And in fact, to the contrary, as the court knows, every year you have to apply to remain a self-insurer. Don't the regs say self-insurance is authorized only for 12 months? That's right. They're one-year intervals. And so you have to reapply. And so we've called the court's attention to the list of mines. It's at 3295. When Arch sells Hobet, it then applies to remain a self-insurer, as it is, I believe, to this day. And it submits its new list of mines. It doesn't include the Hobet mines anymore. Magnum submits its list of mines, and it does include, or Patriot later on submits its list of mines, and it includes all the Hobet liability. And crucially, the department approves this at every step of the way. So they know the regs are based on one-year intervals. The amount of financial security you have to have is based on a one-year interval. I'm sorry to cut you off, but aside from knowing, once Arch sold Hobet and those other subsidiaries, and once, I guess it was Magnum and Patriot after that, became subsequent self-insurers, do you know whether the department sold, named Magnum or Patriot as responsible self-insurers for claims for miners that were last employed when Arch owned Hobet? No. So when Patriot, Patriot never employed Mr. Meredith. I understand that. I'm trying to find out if there are people in Mr. Meredith's shoes who never worked for Magnum, never worked for Hobet while it was owned by Arch, never worked for Magnum. Did the department in claims like this one ever seek to hold Arch liable before, or did they seek to hold Magnum and Patriot liable? In the past, the longstanding practice, through many bankruptcies, because this is hardly the first coal company bankruptcy out there, nor is it the first merger, the department has consistently excused, I guess, but that's not even the right word, just recognized that there was no liability for someone in Arch's position, and so we call the courts. Let me, you're answering a slightly different question. Okay. I apologize. That's okay. I might probably ask it badly, so don't worry. I hear your point that they did they instead name and seek to have Magnum and Patriot cover the benefits for miners, even though they never worked for Hobet when Magnum or Patriot owned it? Well, no, because in those circumstances, Patriot would have gone bankrupt, and so they would be incapable of assuming that liability. They went bankrupt when? I think 2015. Yeah. So how about that interim period? Yeah. I mean, you sold them in 2006, right? Right. And 2006 to 15, they're miners who were making benefits claims, and the last time they were employed, they worked for Hobet when Arch owned it, right? And in Your Honor's hypothetical, this person didn't work for Magnum? Correct. Okay. Just like Mr. Meredith, except the claim is made before 2015. So either Magnum or Patriot owns Hobet. Right. In those cases, did the department seek to hold Hobet slash Arch responsible? Yes. Yes. No. Well, no. How about Hobet slash Magnum, Patriot? So Magnum was a commercial insurer, which complicates it slightly, but to my knowledge, they never reached back to Arch when somebody who worked for Patriot. Did they ever seek money or seek to have Patriot pay claims for miners that worked for Hobet before Patriot acquired it? Miners who worked for Hobet before Patriot acquired it, did they ask Patriot to pay that? Correct. As a self-insurer of all the under companies. No, because at that point, they would not – I will read this in a moment and address it when I get up on rebuttal. I must be turned around with the hypothetical, for which I apologize. Yeah, I think I've got it. But let me say this. The abiding thread through all of that is that if Patriot – Patriot's a self-insurer. So at all times, if the claim is made while Patriot is self-insuring, then they're on the hook for it, just as we were on the hook for claims made during the time when Arch was self-insuring and Hobet wasn't. And do you know that that happened? Patriot's on the hook as self-insurers. Do you know whether the department saw benefits from Patriot? I think I understand your question. I believe the answer is yes, but I'll have to check the record, and I suspect Mr. Terry may have given me a hint. I might be on the Facebook page. The important thing for which I – again, what we know, though, as to the liability for prior bankruptcies, and Allen and Atkins – we cite these at pages 35 and 36 of the opening brief – explain how they assumed that all black-lung claims were transferred to Magnum, and that that was stated. It was known to the department, and they followed that rule for a long, long time. And then only more recently did they start with this insurer liability theory. And in the briefing here before this Court, the department points to 726.103 as the basis for that. That not only is not the basis given by the agency below, by the ALJ, it was in fact expressly repudiated by the ALJ at page 569 of the Joint Appendix, in which the ALJ correctly points out that Section 726 – I can read you the quote – Section 726 of the regulations govern only how an operator must secure its existing liability. It does not create liability. And the BRB didn't rely on 726 either. Yes. Well, the Board's opinion is rather brief, as Your Honor knows, and merely says this looks good to us and cites to a couple of cases that discuss different issues. Notably, the Seventh Circuit in Grimes actually picks up the exact same Graham, Bailey, and Howard and explains why they don't apply. If I can commend one thing to the Court's – You had two circuits weigh in on this in a couple of weeks. It was a busy time for us. Last summer. Yes. In August, even. And there is a cert petition pending, by the way. The Seventh went one way and the Sixth went the other way. Within 14 days. Within 14 days. And we had one before either one of them. Well, this Court has had more than a few. That went against you, too, didn't it? Well, you had the Workman case, which is slightly different. I'm happy to talk about that, which Your Honor knows. No, but there were three cases on this, three circuits, within two to three weeks. Well, you're on the good side of the circuit split as to Chenery. Because, remember, this is a Chenery problem. They're showing up now and pointing to 726. 103 is a Chenery problem. 726. 103. Yeah. And this Court, in fact, Judge Quattlebaum wrote it last year in American Energy, the good case, American Energy versus Director. That's one of them that we cite in our cert petition. It's number 724.784 at the Supreme Court, if you want to see the cert petition. This Court is on the right side of the Chenery split. It applies Chenery in BLBA cases, and rightly so. 726.103 is wrong in the merits, set that aside, but it is definitely prohibited by Chenery. Well, in the Sixth Circuit decision, if I don't have it confused, I thought their holding was Arch didn't put on any evidence, and because they didn't put on any evidence, we're not going to affirm their claim that it was an evidentiary ruling. And you've got a lot of evidence in this case. The Sixth Circuit is largely, like Workman, focused on the evidentiary component. There is a short part where they kind of have a glancing blow at the basis. Again, insurance liability doesn't come from nothing. They take a stab at an insurance basis, and they come up with different provisions, actually, than the Department of Labor cites here. They cite 726.110 and I believe 726.4, both of which the Seventh Circuit in Grimes points out are not applicable, but more than that, they aren't even argued by a party. They're inserted by the Sixth Circuit. In a case without oral argument, I mean, there's a whole bunch that goes on there. Can I ask a kind of related question? This may seem bizarre, and neither of the parties, I don't think, talked about it. So if it seems bizarre, just say that's a crazy question. Don't worry about it. I doubt I will say that. But the regs in the statute talk about the procedures for making claims and who can be liable, and the regs talk about insurance issues to some extent. But if there's a question about an insurance coverage, what's the scope of an insurer's liability, be it commercial or be it self? Does the agency have jurisdiction to resolve coverage issues pertaining to insurance? I haven't given that full thought, Your Honor, but I can tell you this. They don't have jurisdiction to impose an insurance liability. Well, usually, I mean, you know, they may have. But that gets to whoever decides it needs. Your argument is, and I understand that argument, whoever decides the question, you can't just make up insurance obligations without some statutory or regulatory or contractual basis. Gotcha. But if the issue is who gets to decide the scope of coverage, let's say it's a commercial case and say, look, I don't have, yeah, I had a cap. Yeah, we probably sat through a case where there was a cap. Yeah, we have a cap. We only pay $10,000 per claim. And so I don't know anything. Is that something that this agency has authority to resolve? I think so because in the regulations, assume that it was an operator, a cleaner case than this one. Right. Suppose you had somebody who was an operator liable. Right. And they have insurance, self or commercial. One of the questions for identifying a potentially responsible party in 725-494 is whether that person has assets to cover the cost. Is the operator capable of assuming its liability? And the presence or absence of insurance is one of the ways that you determine that. So I think the answer to your honest question is yes, they have jurisdiction, because they have to decide if the operator, in that example, is capable of covering the liability. If not, we go to the trust fund. In this case, the operator, we know the answer. It's actually kind of an easy case in some ways. The operator is known to be incapable of covering this liability, so it should go to the trust fund. Only because, and we point the court's attention to the GAO report, only because the department has terribly underfunded the trust fund is it now trying to pass off insurance liability to other operators but without any basis in law. So mindful of my time and trying the court's patience. I think that's the abiding question, and there's just no answer in this case. It can't be 726-103. One more question. Please. Let's take this as a quasi-hypothetical. So you have a claimant just like the claimant in this case. He works for Hobbit. The day before Hobbit is sold, he's injured. And there's no question he's entitled to recovery. He doesn't make a formal claim until the next year. So the self-insurance, per se, of Arch has expired, and Hobbit has self-insurance through somebody else. Who, under your theory, would pay that claim? Well, not Arch. There is this question, and the other side points to, I think it's page 32 of their answering brief, where what happens if the subsequent company is commercial insurance as opposed to self-insurance, such that there could be a gap in coverage? And we quote the department's own expert. It's page 14 of the reply brief, where he explains, we know that. We know that that's a possibility. It doesn't happen very often. In fact, I think it may never have occurred. But where you could, in theory, have somebody who falls between a self-insurer and a commercial insurer, because if the example in your hypothetical, in your honors hypothetical, if the miner had filed his claim that day, that would have been on Arch. But once Hobbit is no longer part of Arch, Arch's self-insurance is done. Maybe you could have an interesting case if it was before the reapplication. You know, before the DOL, you know, considers your new list of mines and your financial securities and approves everybody. And it's within the 12 months. If it happened within the 12 months, and, you know, this is a dangerous thing. I thought the question was beyond the 12 months. But beyond the 12 months, yes. Suppose that it's transferred to a new self-insurer, then that person covers it. If it's been transferred to a new commercial insurer, then you have this gap that Mr. Benedict talks about, again, 14 of the reply brief. It's a claims made in the self-insurance world. So even though he was injured on the job when Arch still owned Hobbit, the next guy who owns Hobbit is the one who's on the line. That's correct. So you're going to apply insurance law rather than a regulation? I mean, the regulations assume insurance law. The structure of the regulations having subparts B and C for self-insurance and commercial insurance respectively, those are built around the existence of the insurance market. In fact, you know, we cite the First Circuit's decision in the Harvard case versus Zurich insurance where that court explains how the core of self-insurance is the claims made trigger as opposed to the accrual trigger where a commercial policy covers any injury that accrues during a certain time. Why then would there be – I'm not understanding your, you know, dialogue with Judge Agee about this gap if it's commercial insurance. If it's commercial insurance and you have the accrual concept and liability under the regs goes back to the last – to the operator at the last time the minor was employed, why would there be a gap? I mean, you have insurance. You are responsible if you're a commercial carrier for any claim, I think, that accrues during your period regardless of when the minor worked. Maybe I'm not following it. I'm sorry. No, well, be careful not to blur the operator and insurance obligation.  So – and I could have misunderstood the hypothetical, but in Judge Agee's hypothetical, if somebody is injured, that's the accrual of the event during a period of self-insurance but doesn't make the claim until his company has been sold and now – or it could even be at the same company. Probably not in that case, but the company has been sold and now it's commercially insured to match the facts here.  The commercial insurer would say, your injury occurred before our policy began, and the self-insurer would say, you made a claim after we sold that business. And so that creates a theoretical gap, which they have never pointed to that occurring because here, by the time Mr. Meredith makes a claim, we're under Patriot self-insurance. So he doesn't fall in a gap. He was – But with Magnum, you said that was commercial. Magnum was commercially insured. So if Mr. Meredith had made his claim during the Magnum time period, would you say there's no self or commercial insurance? That's right. Then he would go to the trust fund because nobody would be on the hook to pay for that. But that is – Please don't let that cause consternation. It is a hypothetical that the other side raises to try and knock down the statutory and regulatory framework here, which it doesn't do. And that's why I've pointed a couple times to Mr. Benedict, who was the self-insurance czar at the Department of Labor, who explains it at page 14 of the – we quote it at page 14 of the reply brief how that was a known feature that it could occur, and yet they recognize that the – he says there's a gap because the self-insurer is not on the hook. So the right way to view that is that it confirms the way that self-insurance works, which is self-insurance stops when you're no longer part of the self. So in your view, this gap, theoretical gap, could be closed, but I'm assuming you would say it would require congressional action or – I'd settle for notice and comment. A regulatory – the adoption of a proposed rule that would go through all the APA requirements to get there. Precisely. And the one thing that you cannot do is skip the APA rulemaking and do it retroactively to ARCH. That's – I mean, PAH versus CFPB points out that it's a due process problem in addition to an APA problem if you change this and apply it retroactively. So they could clean this up. They haven't done that. And as a result, there's no statute, no regulation, no contract that would oblige us to pay this. So we ask that the courts direct this to the trust fund so that Mr. Meredith can be paid appropriately. Thank you, sir. Thank you. You saved some time, I think. Mr. Austin? Mr. Austin, it's good to see you. Good to see you, Judge King. Good morning, Judge King and the other court members. It's always a pleasure to be here before the Fourth Circuit. I bring a bit of a different perspective, I think, to this case because I'm here today just representing the claimant, Mr. Meredith. May it please the court. My goal here is to say a few quick things and kind of get out of the way and let the other players discuss this. Your client's going to get paid either way, right? I'm sorry? Your client's going to get paid either way. Absolutely, Your Honor. But one point, I'll just go ahead and make this point. I don't want it to be lost that my client's being paid and he's good because the truth of the matter is there's still other things that need to be done in this case. He's owed back pay. He's owed finality. Of course, attorney's fees are not paid until this thing is over. So there's still a lot on the hook, and we have been, you know, kind of along for the ride, if you will, for the last several years. And, you know, he filed this claim back in April of 2019. So next month, that means six years ago this case was filed. And what's really interesting is at the hearing in 2021, you know, I guess on the merits, this case was finalized in favor of my client that he's going to be awarded final benefits. But here we are, you know, four years later, we're still kind of litigating this case. And so – Well, you're not litigating his entitlement to pay. That's true. When's the – remind me if you have it handy or know it, the day Magnum sold to Patriot. Your Honor, it was 2006, I believe, Your Honor. That's to Patriot, or that's the second sale? So it was 2005 was the initial sale, and then I think it was the very next year that – Magnum to Patriot? Correct, Your Honor.  And we have –  That's my recollection. So there are nine years of time, I guess, before – that Patriot owns – is it Hobbit or Hobbit? I think they say Hobbit, Your Honor. That's what I hear. People that live in that region call it Hobbit. Correct, Your Honor. Okay, Hobbit. So – It's a big employer around there. That's correct. It's a big operation. It has been historically. It may be closed down by now. I don't know. Judge King, you know quite a bit about the company. I was impressed as I listened there on –  I said you know quite a bit about the area, and I was impressed by that.  Thank you. I'm familiar with the geography. So what's the – so there's nine years that Patriot owns Hobbit that – before Patriot files bankruptcy? Let's see. That would be to 2015. That's correct. Yes, Your Honor. Do you know – I mean, this – whether it's in – first of all, whether this is in the record. But for claims from 2006 to 2015 for miners who worked in the Hobbit mine, do you know whether those claims were made to Patriot during that time period? Your Honor, I can give you an answer, but I think Mr. Bukowski needs to give you the definite answer. Okay. I believe they were. You know, as Your Honor knows, I handle about a thousand of these a year. And I understand why you're asking me that.  Because – I don't want to put you in a bad spot. It's my recollection that they were. Okay. But please confirm that with Mr. Bukowski because he's the real expert on that. Okay. All right. So – Last factual question. I read somewhere in the record that, you know, this claim dealt – came out of – did it come out of Mingo County? That's correct, Your Honor. Go ahead. Mr. Barrett, it was from Mingo County. Correct, Your Honor. That's correct, yeah. That's down the road south of Hobbit. That's correct, Your Honor. It's got that building made of coal downtown, right? I think that's actually in Williamson. Is that Williamson? Yes, Your Honor. But there may have one in there as well. I'm familiar with the Williamson one. Yeah, that's the county seat of Mingo County. That's correct. And you're from over the Virginia side? Just a few hours across the border. That's right. I have some family from over in this area, though, that we're talking about in this case. So, Your Honors, like I said, I'm kind of in a unique position. I'm kind of along for the ride, but here's what I'd ask the court to do. Your Honors mentioned all of these various cases. I've been a part of these cases at about every level in several different federal circuit courts. We're looking for finality. We're looking for a square decision on the issue because this is something that's being litigated very frequently from our perspective down in the trenches. And I think the ALJs do not really have clear-cut authority on what exactly they should do. And I see that I'm out of time. If I could just finish this point quickly. We're just asking for finality. It's been six years. My client is entitled to benefits. There's no question of that in this case. And we're just asking that the court make a decision as quickly as possible. We would ask that the court affirm the decision below from the Administrative Law Judge and the Benefits Review Board. Thank you for your time. Thank you, Mr. Alston. Mr. Patowski? I apologize if I mispronounced your name. No, you got it right. Good to have you with us. Not too many of my people came over this way. Good morning. Good morning, Your Honors. May it please the Court. My name is Sean Patowski. I represent the Office of Workers' Compensation Programs. A lot to say in response to what my counterpart wrote, but I wanted to bring up one thing before we get to that, which is that I think this Court already cited this issue in the Workman case. Workman was a case where ARCH challenged liability. It also involved Hobit and a miner who last worked for Hobit before the sale. And when it was covered by ARCH's self-insurance, the claim was filed after that. Exactly factually like Mr. Meredith. Were the same issues argued and advanced by both parties? Yes, I think if you look at their brief, there were some additional issues in Workman. But if you look at their brief in Workman, they have the same basic issues they have here, where they talk about, you know, that this liability regime improperly treats commercial and self-insurance the same, even though they're on different parts of the regulations. So you think... That there's, you know, the veil-piercing applies. Okay. Now... But that's unpublished, correct? That is unpublished. It's unpublished per curiam. I was on the panel. I know. I'm not going to tell you what it said. And it was decided August the 2nd, I think. Yes. Of 2024. So it's not precedent. I think it's... It's not controlling precedent here. Well, it's not controlling precedent for...  But we haven't... We haven't decided, authoritatively decided the issue. I don't think it worked because of the fact that it's... as my friend Judge Aden pointed out, it's unpublished per curiam. That's true, Your Honor. But I don't think an unpublished opinion could undermine... But it supports your argument. It makes it not valuable for stare decisis if it's against another party. But if you're a party, you bring a case and you litigate it and you lose, that's still estoppel against you for re-litigating. You don't get to re-litigate it over and over again just because the decision was unpublished. It is. That's the self-insurance question involving OBET. Well, both of the six, right?  I'm sorry, Your Honor. It involves OBET and ARCH. Yes, it involves OBET, ARCH, and the Labor Department, are the parties that... The real parties interested in the dispute. Now, there was also a dispute in Workman about the evidentiary... the rules that set timeliness of regulations. The main difference between this case and Workman is that all the facts that are... most of the evidence that's in the record in this case wasn't in the evidence in Workman. The reason it wasn't in the evidence in Workman, because ARCH didn't submit it on time. They blew their deadline by, I think, more than a year before they tried to put it in. But they have evidence here. So you have evidence here, but you didn't have there. But again, that was ARCH's decision. It's evidence... There's no evidence here that ARCH could not have put in the record or sought to develop in Workman. It was exactly the same procedures that applied, exactly the same discovery that applied. You say that's binding. We decided in Workman there was no evidence. Therefore, they could not recover. The Sixth Circuit made the same decision. I think that's right, Your Honor. I don't think you can, you know, sit on evidence that you have, not put it in the record, litigate, see how that goes, and then see how that decision turns out and try it again with some evidence. Your argument isn't that we're bound by Workman in terms of the legal analysis. Your argument is that on race judicata principles, ARCH can't argue this again.  This is not... It doesn't establish it as a matter of law for this circuit as a whole. It doesn't really bind this panel in that sense. But it does bind ARCH as a matter... You know, it's an issue of inclusion. Of course, you have a different claimant. So it's a different party. There is a different party. But the claimant has... The real party that interests to the liability question are the employer, ARCH, and the government. The only real live question here is whether the issue, the issue that we'd say ARCH is precluded on, is does ARCH have to pay these kind of claims or doesn't it? What about these cases in the Sixth Circuit and the Seventh Circuit? Do you think that they are a circuit split? Are they reconcilable? Are they... Well, there is definitely a circuit split between the Sixth and Seventh on whether Chenery applies to board decisions. The Sixth Circuit has said... And the Sixth Circuit is consistent with Workman, you think? I think the Sixth Circuit decision is consistent with Workman. And the Seventh Circuit is inconsistent with Workman. Yes. And I think that... And also, before I leave this, I'll stop a point. I want to say that this is not... It's not just ARCH's second bite at the apple. They got a third bite already primed up. They've already briefed another case with a claimant's name as Fridley in this circuit that raises the exact same issue. So let's... Matt, I appreciate your point. And there may be... My colleagues may have more on the estoppel thing. But let's kind of assume we're not bound by res judicata principles and we can look at this case on the merits. Is it correct that in this 06-09 period, the department sought to have Patriot pay for claims for minors whose last employment for Hobit was during the time ARCH was the parent? I think... I'm going to... Slightly simple. There is a little bit of complexity there because there was a period where Magnum had... I'm trying to say 06. Let's leave it out. Yeah. There's no dispute that after... After... Starting in 08, definitely. When Patriot... After Patriot acquired for claims based on employment, both before and after the sale, DOL would name Patriot. And Patriot would pay if liability was determined? Yes. And that's because, you know, again, you can have multiple parties really be liable for an individual black lung claim. But OWCP is only allowed to identify one liable party before it sends the case up to the administrative law judges for a hearing. And that's because the theory is that it's unfair for one claimant to have to litigate against multiple different parties, defending them on the merits of medical entitlement, for example. So let me interject here before you go on. Are you saying that, say, if this claim had been filed in 2010, Patriot is a self-insurer of the folks on down the line, that Patriot would have had to pay that claim? Yes. We would have notified... Yeah. When? When? Well, you say you would have. I think the better question is, during that period, did you ever do that? We definitely named Patriot for claims where the minor... And that's where are we... In a situation like Mr. Meredith, for example.  Where do we find this in the record? But the 06... Where do we find this in the record? Well, we admit it in our brief that it happened. And I think that's also what happened in the... I was getting confused because there's three names, case names that all begin with A and are short. The Allen case that Arch relies on, that was a case where the minor last worked before the sale and we notified Patriot of its liability. And that was because, again, like I said, we could only name one and really Patriot and Arch were both liable. So your position is that if this claim had been filed in 2010, Hobit, there were two self-insurers and you got to pick between one? Yes, what happened was, Arch... I said yes? Yes. I know what happened. I'm just trying to understand. Your claim is that there are two self-insurers at the same time? Yes, that is possible. Is there... Because of the kind of unique way that Patriot's self-authorization was retroactive. Is there anything in the regs that supports that, that says once you approve and you pursue a purchaser of a subsidiary and claim that they're the self-insurer, that you can, if they're not available as an insurer, go back to another insurer? I don't think there's anything that explicitly addresses that. But, again, it's not... You can't make it up. Pardon? You can't make it up. I know. There has to be a source in the law and the ALJ and the BRB, to the extent it made any finding, relied on 725.494 and 495. So I think the crux of the case is, you need to tell us exactly where we find in those regs the liability established for Arch in this case. I think that 494 and 495 are... Can I take a step back for a second? I think we need a little bit of context. I think this is ultimately a regulatory interpretation question. And that's sort of aside from the Chenery. If you think there's regulatory justification that's not the one the board gave, then you have to remit it. But I think it's important to point out that this is not... We're not working on a blank slate here. This idea of parental self-insurance, as Judge Quattlebaum said, it's not something that the regs talk about explicitly. The regulations are typically written in a really kind of... They take the simpler scenarios. They involve an employer that's directly liable for its own employees. They talk about insurance companies. What I'm looking for is language in either one of these sections that satisfies what you're arguing, that establishes the liability. Because I think we agree you can't make it up. Can't make it up, Your Honor. Well, I think... And Arch had nearly everybody who was somebody at the Department of Labor come on as a witness and say they never did this before the Patriot bankruptcy. That is not true, Your Honor. I mean, it's true that they say that's what happened. What their witnesses say is that they have a bunch of people testifying about what their opinion of what the law is. They don't have people testifying about past practice, which would be relevant. And the actual past practice supports DOL's position here, not Arch's. Could you... I know you went off based on part of that question, but Judge Agee's initial question is, let's look at 725-494 and 725-495 and talk specific section numbers in specific language that supports your view. Well, I think that... I don't think that 494 and 495 standing alone support liability directly. But when you look at it in terms of the self-insurance regulations which apply the same standards for commercial insurers to self-insurers... So that's the 103 section? The 103 and also the 207, which is the commercial insurance rule that says you're basically put in the shoes of the operator if you're an insurer. So I think that, by analogy, it works to treat... I just want to make sure. On 103, I'm familiar with that one. Do you agree that neither the ALJ or the board use that in its justification? I do, Your Honor. Okay. And 207, is that 725 or 726? 726, sorry, Your Honor. That's okay. I just want to get there and not be caught with numbers that I don't know what we're talking about here. So if that's the basis of your argument, and if we apply Chenery, then you lose. I think you'd have to remand the case unless, of course, you found... Well, why would we need to do that? The Seventh Circuit didn't see the need to remand in that circumstance. Well, I think the Seventh Circuit was wrong on a couple of reasons, and one of them was remand. Nobody argued about remand in that case. Is there a cert petition in that case? There is a cert petition in the Sixth Circuit case, Howard. There is no cert petition. But not in the Seventh Circuit? No. In the Seventh Circuit case, I think that I don't see how they reached the idea to reverse it. If you look at Chenery, Chenery itself didn't reverse it, remanded. And that's sort of the usual, that's kind of the standard rule, the regular remand rule, the Supreme Court calls it, that when an agency, you can't affirm an agency decision, what you do is you remand it to the agency. I thought there was something in the regs that was kind of unique here, which says if this initial classification of responsible operator is wrong, there's not a redo. Oh, that is true. There is no redo. If at the end of the day, you know, this court decides that ARC is not liable, then the only other option, then it's going to be paid by the trust fund. But that, I think, is a different question than whether it's okay to say, well, the court, we don't agree with the rationale, the particular rationale the board gave. There may be other rationales that could support it. But we'll just go to reverse rather than remand. Even though you tried the case on this basis, you want us to remand if we agree with opposing party, so you can go back and try it on another basis. Well, I don't think that's entirely. I think there's a reason that the case was argued the way it was, the way it was briefed the way it was. From the beginning of this, ARC has always conceded that, you know, even though it's not mentioned in the regs, and my time is up, but I have a couple things I'd like to say, that even though there are, the regulations don't specifically talk about parental self-insurance, ARC admits that that is a thing that happens and that it engages them and that ARC is still engaged in. That's been a fairly regular practice. And I think that when you have a party that comes up and says, I am on the hook, or at least I was on the hook, but now I am not on the hook anymore, I think it's completely natural to expect that party to explain to you how they got off the hook. And I don't think ARC has done that. Why isn't the regs that say authorization to be self-insured goes for 12 months? And there's not a period from 2006 forward where ARC sought or was authorized to be self-insured for HOBIT mines after 2006. Well, I think that, first of all, let me leave the one-year thing aside, but I think that that is assuming the question here, which is, is the trigger a claim trigger or is it an exposure trigger? Because if it's an exposure trigger, that's all that matters. What matters is what self-insurance was in effect when the exposure happened. Well, then I guess that gets to the question of where's the indication that it's the exposure, and that's what we've been talking about already. Right. Well, I think that, well, I would like to flesh that out a little bit. I think that, one, if you look at this, there is arguably a gap in the regulation here, even if you, aside from 103. But even without 103, there's a gap in regulation. So you have a question of this parental self-insurance, what trigger date does it use? And you have the question is, well, then you look at the context, and you look at the regs, and every single time the regulations apply any kind of liability trigger, it is a last exposure. That's for employers, that's for commercial companies or commercial insurers, that the only time, the only time the regulations ever employ a claim trigger is when it is physically impossible to have a exposure trigger, which is a situation where it's your very first policy in 1974, and you want that policy to cover claims that were filed before that, before operators were required to have insurance and they didn't have insurance. Every other situation has that. And you add that to the sort of practical, you know, impracticality of having this, you know, back and forth, you know, you have this constantly fluctuating coverage and not coverage, and you have DOL's past practice, which is, I think, best explained, or best exemplified in the old Ben Cole cases. Now, as Mr. Dre pointed out, it's, you know, hardly, this is hardly the first time a coal company has gone bankrupt. But the situations of Patriot's bankruptcy are actually quite rare in combination. First off, most coal companies have commercial insurance, not self-insurance. Secondly, the ones that are self-insured tend to be more stable. That's why they get authorization to self-insure. Three, most companies that go through bankruptcy, most coal companies that go through bankruptcy aren't, you know, liquidated. They don't have their black lung liabilities expunged. They're just reorganized, but they keep all the black lung liabilities they had before. You know, that happened with Arch just a few years ago. It went through a reorganization process, and it came out, but it wasn't released with any of its black lung liabilities. So you need all those things to be true, and you need that company to have bought at least one subsidiary from another company that was itself self-insured in the past. And that's not very common, but it is exactly what happened in the Horizon situation. You had Old Ben Coal Company, big coal mine out in Illinois. It was owned by Standard Oil, and then it was transferred ultimately to Horizon, and it went bankrupt when Horizon went bankrupt. Now, when claims came in after the bankruptcy, we would look at, you know, DOL looked at base liability on the last exposure to dust. And if your last exposure was before the sale, we based liability based on that. So we'd go up the chain. Obviously, Old Ben can't be liable. It's gone. You move up the step to Standard Oil, which was also gone. So then you move up to the third step, which is the surety that wrote a bond covering the self-insurance, covering Standard Oil's self-insurance, which, again, included its subsidiary, Old Ben, just like ARCH's self-insurance included Cobay. And that, I think, shows the department's past practice on this and why ARCH has no reason to say that they're surprised by this. And I think that while that shows practice, what shows that that's correct are the D.C. Circuit's decision in the U.S. versus Insurance Company of North America cases where they interpreted this black long surety bond and said, these are not claim trigger bonds. These are exposure-based bonds. And why would you ever have a bond, you know, these bonds only exist to cover, to backstop a self-insured operator's black long liabilities. Why would you have a bond that is, you know, based on your employment date when it's covering a liability that's based on this totally other thing, this claim date? You know, that wouldn't make any sense. I could talk to yourself, but if Your Honors, I see I'm well over time. If Your Honors have no further questions, I would like to ask you to affirm or, on the alternate, remand the case. Thank you. Thank you for your help. Good to have you with us. Mr. Dray? Good morning. Still morning. A couple of quick points on rebuttal. First, Workman. Workman is a desperate and, frankly, slightly offensive attempt to use a case that was about something else. I direct the Court's attention to the paragraph at the bottom of page 6 in that decision in which this Court says, Arch seeks reversal based entirely on evidence outside the administrative record. Going on, Arch does not contest that on the record, Workman was entitled to benefits, and Arch satisfies all the criteria of a responsible operator. Those are different arguments. In this case, the evidence was admitted, although it didn't play a role, but the evidence was admitted, and we certainly contest that we're on the hook as an operator. Totally different legal issues. That was an evidentiary case in Workman. It doesn't comport with Park Lane or any of the issue preclusion cases. The other thing about Workman that's sort of notable is that they didn't argue 726-103. Let me make sure I understand that. I agree the basis of the decision is evidentiary. It's a different decision based on that. But is it your position that if you had this same argument, you know, that you're making today, in that case you could make it here for the first time, even though you could have made it then? I suppose not. But you'd have to have fully and fairly litigated it in the prior case. They did not do that?  And if we were going that direction, Grimes would be res judicata in our favor, because it came out before. So this sort of game of infinite regress that they want to play doesn't even end where they think it does. The controlling case, if anyone was going to be issue precluded, it would be Grimes that controls all of this. But Grimes is a new point. Grimes is not in our circuit. It doesn't matter. But what does matter, doesn't it, is whether Grimes is a claimant and they didn't have the opportunity. I mean, Mr. Meredith gets to make new arguments. Oh, of course. I'm sorry. Yes, also different parties. That's important. Well, for the claimant, not for you. It's not for us. That's true. But, you know, I'd have to look back at issue preclusion exactly. But to use non-mutual offensive issue preclusion, we at the very least have to have fully and fairly litigated the same argument. See, that's why I wonder, and maybe that's right. I mean, if you had the argument available but elected not to make it or didn't fully make it, you know, I think the question is, do you now in a subsequent case get to make a new argument when you had the opportunity and didn't before? I can't recall the rules. Let me give two responses for when and if the court goes and digs into it. One is not only must we have made it, but it has to have been actually decided and necessary to the decision before, which couldn't have been the case if it was an evidentiary decision. Additionally, in those cases, the issue was not the same because nobody argued 726-103 or what I heard for the first time just now, 726-207, which is not in the answering brief if you take a look. The department's bad habit in these cases of coming up with post hoc rationales really has to stop. It was on display right here today, and that is what the Grimes court rejected. And the suggestion that if they can identify something new on appeal, that what the court should do in light of Chenery is send it back so that they can try again, that's not how Chenery works. Chenery says you, appellate counsel, capable and affable though you are, are not allowed to replace the rationale. You're stuck with the rationale that was given. In this case, the rationale that was given below is, as best I can tell, at I think it's 597 of the JA, excuse me, 567, is operator liability based on 725-494 and 725-495. They are stuck with that. You just heard from Mr. Austin. Don't send this man back. Don't delay this any further. It's what the Grimes decision rejects what it calls administrative ping-pong because it shot down the suggestion that it should go back for a mulligan. The court should absolutely reject that out of hand. The one thing that the court that we never heard in that presentation was a statutory or regulatory or contractual basis for insurance liability. The closest we got was pointing to 494 and 495, which again are operator liability, and Hobet was the only operator. The example of Old Ben, for example, in Old Ben, the parent company of the operator declares bankruptcy. There's no arch character in Old Ben. It's just not on all fours. In INA, the very premise of that is that insurance is a contract, that the bonds are contracts, and that would be the source of positive law in that case. But there, the court applied self-insurance to claims filed during the time of the bond. So that's the claims filed trigger that we're advocating for. Ultimately, the department can't escape its obligations to provide a reasoned basis or to go through formal rulemaking to change it. With that, we ask that you vacate the decision. Thank you. Thank you very much, sir. Good to have you with us. We'll come down and greet counsel, adjourn court for the day, and wish everyone safe travels. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Robert B. King, G. Steven Agee, A. Marvin Quattlebaum Jr.